[Sac. No. 1732.    Department One.—July 9, 1912.]

## UNION CONSTRUCTION COMPANY, Appellant, v. WESTERN UNION TELEGRAPH COMPANY, Respondent.

AGENCY—DECLARATIONS OF UNAUTHORIZED PERSON ACTING AS AGENT—EVIDENCE INADMISSIBLE.—No person is bound by the declarations of another who is not his agent and expressly or by implication authorized by him to make the declarations. Unless at least *prima facie* evidence of such authority appears, such conversations are not admissible in evidence.

ID.—AGENCY NOT PROVABLE BY MERE DECLARATIONS OF AGENT.—Agency is not provable by the mere declarations of the agent, not made under oath or in the presence of the principal, unless communicated to, and acquiesced in, by the principal.

JUDICIAL NOTICE—DISCOVERIES AND INVENTIONS IN COMMON USE—TELEPHONE.—The courts take notice of discoveries and inventions that have become of common and general use, such as the telephone.

ID.—BUSINESS CONDUCTED BY MEANS OF TELEPHONE—DISPUTABLE PRESUMPTIONS AS TO REGULARITY.—The telephone and its use have become so much a part of daily life and experience, that business carried on over it must be deemed to be subject to the operation of the disputable presumptions or inferences applicable to like affairs, as declared in section 1963 of the Code of Civil Procedure, to wit, "that private transactions have been fair and regular"; "that the ordinary course of business has been followed"; and "that things have happened according to the ordinary course of nature and the ordinary habits of life."

ID.—CONNECTION MADE BY CENTRAL OPERATOR WITH PARTY CALLED ON TELEPHONE—DISPUTABLE PRESUMPTION THAT PROPER CONNECTION WAS MADE.—In the absence of anything unusual occurring in the process, there is a disputable presumption of fact, arising from the almost invariable result, that a request to the central operator of a telephone system to connect the caller with a named number in the telephone directory, and to call the subscriber of the telephone bearing such number by means of a bell or other signal, has been complied with by making the proper connection with the number and giving the necessary signal at the other end of the line.

ID.—PERSON ANSWERING TO TELEPHONE CALL—PRESUMPTION THAT PERSON ANSWERING WAS ONE CALLED OR HIS AGENT.—Evidence showing that the plaintiff and the defendant each maintained a business office in the same city, that each had a telephone in such office connected with the same city telephone system, with their respective

names and numbers in the regular telephone directory, that plaintiff called on the operator at the central station, in the usual way, for a connection with defendant's office, that a connection was thereupon made at the central station with some line, apparently in the usual manner, that someone responded at the other end of the line and, being asked, answered that that end was the office of the defendant, was sufficient *prima facie* proof that the person answering was the agent of the defendant at its said office, employed there by the defendant to receive for it such communications as should come in that manner.

ID.—PRIMA FACIE EVIDENCE OF IDENTIFICATION OF PERSON CALLED—EVIDENCE OF CONVERSATION OVER TELEPHONE—WEIGHT OF EVIDENCE.—In the application of the foregoing rule many of the conditions mentioned are usually deemed matters of judicial knowledge, or as implied from other facts, and are not expressly shown. The general rule is that where it is shown that the witness called up the other party at his place of business, through the central station with which both were connected, and received a response as in the usual course of business over the telephone, this is sufficient *prima facie* identification of the speaker at the other end of the line as the party called, or his authorized agent, and that, upon such proof, the ensuing conversation, if otherwise admissible, may be testified to by the witness. The weight of such evidence depends largely upon the circumstances of each case, and is always a question for the trial court or jury.

TELEGRAPH COMPANY—HOUR OF RECEIPT OF MESSAGE—INDORSEMENT OF HOUR ON COPY OF MESSAGE DELIVERED—COPY ADMISSIBLE AS EVIDENCE.—Where it is a matter of fair inference, that an indorsement of a particular time made by a telegraph company upon the copy of a message delivered by it to the party to whom it was sent, was intended by the company as a note of the hour and minute of the arrival of the message at its office, the copy of the message is evidence of that effect.

ID.—FAILURE OF COMPANY TO DELIVER MESSAGE PROMPTLY—EVIDENCE SHOWING GROSS NEGLIGENCE—FALSE STATEMENT THAT MESSAGE HAD NOT BEEN RECEIVED.—In an action against a telegraph company to recover damages arising from its alleged negligence in failing to deliver a telegram that had been received by it early in the evening of a certain day, its gross negligence in failing to deliver the message on that day, or to inform the plaintiff of its arrival, is shown by the facts that its office and that of the plaintiff were situated in the same city at places about half a mile apart, between which there was frequent communication by street-cars; that within half an hour after the defendant had received the message, and while the copy for delivery was lying among the messages in its possession in its office, and there awaiting delivery, the plaintiff inquired

of defendant's agent at said office to learn if such message had been received by it, and was informed by defendant's agent that none had been received; and that, although notified that the telegram was important and that the plaintiff could be communicated with by telephone, the defendant failed to deliver such telegram, or another received later in the same evening, apparently on the same subject, and made no effort to do so, or to inform the plaintiff thereof.

ID.—DELAY IN DELIVERY OF MESSAGE—EVIDENCE OF SPECIAL DAMAGE—LOSS OF RIGHT TO MAKE FAVORABLE CONTRACT.—Evidence that the plaintiff, by reason of the delay in the delivery of the telegram, lost an optional right that it had of contracting for the doing of certain work for it at a stated price, and that subsequenly, under the best contract it could obtain for doing the work, it had to pay a much larger price, is sufficient to show that substanial loss and damage was sustained by it as the result of the delay in delivering the telegram.

ID.—JUDGMENT ENTERED ON NONSUIT—REVIEW OF EVIDENCE ON APPEAL. In reviewing the evidence on an appeal from a judgment entered upon granting a motion for a nonsuit, all reasonable inferences must be resolved in favor of the plaintiff, and the construction of the evidence most favorable to the plaintiff must be given.

ID.—CONTRACT LIMITING LIABILITY OF TELEGRAPH COMPANY—CALIFORNIA DOCTRINE CRITICISED.—The California decisions, upholding the doctrine that a contract between a telegraph company and the sender of a message, whereby it attempts to limit its liability for mistakes or delays in transmission or delivery, is lawful and binding upon all senders of messages who assent to it, and that it exempts the telegraph company from liability, except as stated therein, for any cause except willful misconduct or gross negligence, are criticised, in view of the provisions of the Civil Code germane to that subject.

ID.—PROVISIONS LIMITING LIABILITY ONLY APPLICABLE TO DELAYS IN TRANSMISSION.—Provisions in the contract printed upon the ordinary telegraph blanks furnished by a telegraph company for the use of the public in sending a message, which, after calling attention to the advisability of having a message repeated in order to guard against mistakes or delays, contain an agreement by the sender of the message that the company "shall not be liable for mistakes in transmission or delivery, or for nondelivery of any *unrepeated* message, beyond the amount received for sending the same; nor for any mistakes or delays in the delivery of any *repeated* message, beyond fifty times the sum received for sending the same, unless specially insured, nor in any case for delays arising from unavoidable interruption in the working of its lines, or for errors in cipher or obscure messages," and which further contain a direction that correctness in the transmission of a message to any point on lines

of the company can be *insured* in a manner stated, should not be construed as limiting the liability of the company for delays in the delivery of a message after it has been correctly transmitted and received at the place of destination, but only as limiting its liability for delays and mistakes occurring in the forwarding of a message from the company's desk where it is received from the sender to the company's office where it is written out and made ready for delivery to the addressee.

APPEAL from a judgment of the Superior Court of Tuolumne County.  J. W. Hughes, Judge presiding.

The facts are stated in the opinion of the court.

Chickering & Gregory, and F. W. Street, for Appellant.

Beverly L. Hodghead, and George T. Fearons, for Respondent.

SHAW, J.—The action is to recover damages arising from the alleged negligence of the defendant in failing to deliver two telegrams sent to the plaintiff's agents in San Francisco.

The plaintiff was constructing a power plant on the Stanislaus River in Tuolumne County.  On October 10, 1906, it made an agreement with the Risdon Iron and Locomotive Works, of San Francisco, by which the plaintiff was given the option to close a contract with said Iron Works, within ninety days from said date, for the construction by said Iron Works of a part of the plant, consisting of an additional pressure line, known as the Mine Line, at a cost of one hundred and forty-three thousand dollars, to be paid by the plaintiff. The right to exercise this option expired at midnight of January 8, 1907.  The determination whether or not plaintiff would accept said contract within that time was committed by plaintiff to its engineers, Sanderson & Porter, of New York. Plaintiff's headquarters for said construction work was at Vallecito, Tuolumne County, where H. F. Jackson, its manager, conducted the work.  It also maintained an office in the Kohl building in San Francisco, in charge of H. P. Veeder. A day or two before January 8, 1907, Jackson went to San Francisco, expecting there to receive a telegram from Sanderson & Porter, accepting or rejecting the contract offered by

the Iron Works, and for the purpose of at once closing the contract with the Iron Works if it were accepted. In the afternoon of January 8th, he procured Mr. Field, the agent of the Iron Works, to come to the office of the plaintiff and remain in his company so as to be ready to receive the acceptance for the Iron Works. In the evening a little before six o'clock, no telegram having been received, Jackson and Field went out to dine together, leaving Veeder in the office. Plaintiff endeavored to prove at the trial that it was arranged between them that Veeder should remain in the office for the purpose of receiving the expected telegram, should it arrive, and bringing it to Jackson where he was dining with Field. The court refused to allow this evidence and exception was taken to the ruling. If it appears that this evidence was material the error would be injurious. In the consideration of·the case, therefore, we must assume that such arrangement was· made.

On that day, Sanderson & Porter, sent to plaintiff, at Vallecito, the following telegram regarding this option: "Wire Jackson that we will exercise option on Mine Line and header." The plaintiff's agent at Vallecito received this telegram and thereupon wrote and delivered to the agent of the Western Union Telegraph Company at Vallecito, for transmission to Jackson at San Francisco, the following telegram:

."Vallecito, Cal., Jany. 8, 1907.

"H. F. Jackson, 909 Kohl Building, S. F., Cal.

"Hobart Porter wires he will exercise option on Mine Line and header.

"(signed)   Union Construction Company."

This telegram was received by the telegraph company at its San Francisco office at 8:35 p. m. of that day. It was not delivered to Jackson, or to plaintiff, until after 9 a. m. the next day. Porter had left New York for California and had arrived at Chicago, on January 8th. He there delivered to the defendant for transmission the following telegram:

Chicago, Jan. 8, 1907.

"H. P. Veeder, Kohl Building, San Francisco,

"Advise Jackson that we wired him Vallecito to close option on Mine Line and header.

"(signed)   Hobart Porter."

This message was received at the San Francisco office of the defendant at 6:57 P. M. that day. It was not delivered until after 9 A. M. the next day. These are the two messages which it is alleged the defendant negligently failed to deliver on the day on which they were received at defendant's San Francisco office. The Vallecito message was given to the defendant, by telephone, at San Andreas, California, at 7:55 P. M. of January 8th. The Chicago message was given to defendant for transmission at Chicago at 7:50 P. M. Chicago time, being the same as 5:50 P. M. California time.

The complaint alleges that, after the defendant had received the dispatches at its San Francisco office, and during the evening of January 8th, the plaintiff inquired of the defendant's agent at that office to learn whether or not said telegrams had been received by defendant and was informed by said agent that they had not been received. Jackson testified, for the plaintiff, that he went out to dine with Field that evening and remained at the restaurant with him until nearly ten o'clock. As stated, he was not allowed to testify that he directed Veeder to stay at the office and bring or send him any telegrams that were received while he was at the restaurant. The court also refused to permit him to testify that during his absence at dinner he had inquired of Veeder by telephone in regard to the telegrams. Veeder testified that he remained at the plaintiff's office after Jackson went out to dine, that Jackson left at 6 o'clock, that he was himself absent at dinner from 6:30 to 7:15, that he then stayed in the office until 10:15 that evening, that no telegrams were received or delivered there during that time, and that when he reached the office after dining he looked about to see if a notice of a telegram had been left during his absence. Finding none, he then took down the telephone and called the central telephone office to connect him with the line running to the Western Union Telegraph Company's office in the city. The connection was made and some one responded, apparently at the Western Union office. He then inquired if that was the Western Union Telegraph office and received through the receiver the answer: "Yes." He did not recognize the voice of the person answering and had no means of knowing that he was connected with the defendant's office, except that he had made the call and received the response in the usual and customary manner of telephone

communication.   It was also shown in effect that the plaintiff
had a telephone in its office as a part of the public telephone
system then in operation in San Francisco, that the defend-
ant's office had a like telephone connection, that the telephone
company had printed and issued to its subscribers the usual
directory showing the name, address, and telephone number of
each of its subscribers, among which were those of the plain-
tiff and defendant, respectively, and that the telephone com-
pany operated its system by means of operators at a central
station to make connections between subscribers when called
on to do so and in the usual manner.   The court refused to
allow testimony of the conversation over the telephone between
Veeder and the person answering for the defendant through
the receiver.   There is a sort of a suggestion in the defend-
ant's brief that the court was not informed of the nature of
the conversation sought to be produced.   We do not under-
stand, however, that it is claimed that it was not made to
appear that it related to the receipt of a telegram by defend-
ant for plaintiff at that time.   In view of the allegation above
mentioned on that subject this must have been understood by
court and counsel and the ruling must have been made on the
theory that such a communication was not admissible to prove
the allegation.

The Kohl building and the defendant's office were half a
mile apart.   A street-car line was in operation from a point
near the defendant's office to and beyond the Kohl building.
The excuse offered by the defendant for failing to make de-
livery that evening was that it had no messengers at its office
during the evening.   The Kohl building was in the midst of
the district destroyed by the great fire of April, 1906, and in
January, 1907, there were few buildings near it that were oc-
cupied in the evenings after dark.   The evidence offered, as
will presently be more fully shown, would have a tendency
to prove gross negligence of the defendant in relation to the
delivery of the telegrams.   For that purpose it was material
and, in view of the fact that the court may be presumed to
have granted the nonsuit because it believed no negligence was
proven, it was very important to the plaintiff.   Its exclusion
is assigned as error.

The defendant claims that, under the circumstances we have
stated, the telephone conversation was not admissible as evi-

dence against it, that to render it admissible, it should have been proven, by better evidence than was given, that the person answering the telephone call was an agent of defendant authorized to act for it in receiving and answering the communication. It is, of course, a well settled and just principle of law that no person is bound by the declarations of another who is not his agent and expressly or by implication authorized by him to make the declarations. Unless at least *prima facie* evidence of such authority appears, such conversations are not admissible. If, in the present instance, there is no sufficient evidence of the identity of the person answering the call as the agent of the defendant at its office, the evidence was properly excluded. It may be added that the statement of that person that he was such agent, was not, in and of itself, competent evidence of the agency. Agency is not provable by the mere declarations of the agent, not made under oath or in the presence of the principal, unless communicated to, and acquiesced in, by the principal.

We are of the opinion, however, that there was sufficient circumstantial evidence to make a *prima facie* case of identity and authority. The courts take notice of discoveries and inventions that have become of common and general use. The telephone has been in common use for more than thirty years past. For many years its use, especially in such large cities as San Francisco, has been well nigh universal, more so than the telegraph and almost as much so as the mails. The system and method of communication by that means is universally known among business men. Practically every business house and office has one or more of such instruments and uses it daily and frequently. Large establishments maintain a local system with a special operator at their place of business, with ear to the receiver, to hear calls and answer them or connect the local wire with the person called for or some one authorized to act in the particular matter. The telephone companies keep a large force of operators in their central stations constantly engaged in connecting the wires of the different subscribers who wish to speak to each other. The process of making these connections is so rapid and frequent that it becomes almost mechanical. The telephone companies are engaged in public service of the same character as that of a telegraph company or a common carrier, and they are in like manner

subject to regulation by law, as *quasi* public servants. The contrivance has been found so satisfactory in actual use that a large volume of the important business of the country is now transacted by means of it. It may, therefore, be assumed that, as compared with the whole number, the number of mistakes in connections that are not immediately discovered by both parties is very small. These considerations are matters of common knowledge and they enter into the question of the identification of the defendant's agent.

They show that the telephone and its use have become so much a part of daily life and experience, that business carried on over it must be deemed to be subject to the operation of the disputable presumptions or inferences applicable to like affairs, as declared in section 1963 of the Code of Civil Procedure. We refer to the following subdivision of that section, "That private transactions have been fair and regular," (subd. 19); "That the ordinary course of business has been followed"; (subd. 20); "That things have happened according to the ordinary course of nature and the ordinary habits of life" (subd. 28). These presumptions have been recognized by the courts and applied to the cognate operations of the telegraph and the post-office. If a letter or telegram is duly addressed, prepaid and delivered in the post-office receptacle or to the telegraph company, there is a disputable presumption of fact, arising from the almost invariable result, that it has been transmitted and delivered in regular course to the person addressed. (*Eppinger* v. *Scott*, 112 Cal. 371, [53 Am. St. Rep. 220, 42 Pac. 301, 44 Pac. 723]; Code Civ. Proc., sec. 1963, subd. 24; 1 Greenleaf on Evidence, sec. 40; 1 Elliott on Evidence, sec. 107; 1 Wigmore on Evidence, sec. 95.) For like reasons, if nothing unusual occurs in the process, there would be a disputable presumption that a request to the central telephone operator to connect the caller with a named number in the directory, and to call such subscriber by means of a bell or other signal, has been complied with by making the proper connection with the number and giving the necessary signal at the other end of the line.

For these reasons we conclude that when it appeared that plaintiff and defendant each maintained a business office in the same city, that each had a telephone in such office connecting with the same city telephone system, with their respective

names and numbers in the regular telephone directory, that plaintiff called on the operator at the central station, in the usual way, for a connection with defendant's office, that a connection was thereupon made at the central station with some line, apparently in the usual manner, that some one responded at the other end of the line and, being asked answered that that end was the office of the Western Union Telegraph Company, there was sufficient *prima facie* proof that the person answering was the agent of the defendant at its said office, employed there by it to receive for it such communications as should come in that manner. All of these conditions were shown to exist upon the trial of this case, either by direct evidence or by fair and reasonable inference, or as matters of judicial knowledge.

The question has never heretofore been considered by this court. It has frequently arisen in other states and the decisions in the main support our conclusion. The following cases, in effect, declare the rule to be as we have stated it: *Wolfe* v. *Railway Co.* [1888], 97 Mo. 481, [10 Am. St. Rep. 331, 3 L. R. A. 539, 11 S. W. 49]; *Globe P. Co.* v. *Stahl* [1886], 23 Mo. App. 451; *Guest* v. *Hannibal etc. Co.* [1898], 77 Mo. App. 262; Kansas *C. S. Co.* v. *Standard W. Co.* [1907], 123 Mo. App. 13, [99 S. W. 765]; *Star. B. Co.* v. *Cleveland F. Co.* [1907], 128 Mo. App. 517, [109 S. W. 802]; *Rock I. etc. Co.* v. *Potter* [1889], 36 Ill. App. 592; *Rogers Grain Co.* v. *Tantor* [1907], 136 Ill. App. 533; *Godair* v. *Hamilton N. B.* [1907], 225 Ill. 572, [116 Am. St. Rep. 172, 8 Ann. Cas. 447, 80 N. E. 407]; *General H. Soc.* v. *New Haven Co.* [1907], 79 Conn. 581, [118 Am. St. Rep. 173, 9 Ann. Cas. 168, 65 Atl. 1065]; *Knickerbocker Ice Co.* v. *Gardiner Co.* [1908], 107 Md. 571, [16 L. R. A. (N. S.) 746, 69 Atl. 405]; *Miller* v. *Lieb* [1909], 109 Md. 425, [72 Atl. 466]; *Conkling* v. *Standard O. Co.* [1908], 138 Iowa, 596, [116 N. W. 822]; *Western U. T. Co.* v. *Rowell* [1907], 153 Ala. 314, [45 South. 73]; *Barrett* v. *Magner* [1908], 105 Minn. 120, [127 Am. St. Rep. 531, 117 N. W. 245]; *Holzhauer* v. *Sheeny* [1907], 127 Ky. 35, [104 S. W. 1034]; *Gillilland* v. *Southern R. Co.* [1910], 85 S. C. 36, [137 Am. St. Rep. 861, 27 L. R. A. (N. S.) 1106, 67 S. E. 20].

There are a few decisions to the contrary: *Young* v. *Seattle T. Co.* (1903), 33 Wash. 225, [99 Am. St. Rep. 942, 63 L. R.

A. 988, 74 Pac. 375] ; *Planters etc. Co.* v. *Western U. T. Co.* (1906), 126 Ga. 621, [6 L. R. A. (N. S.) 1180, 55 S. E. 495] ; *Murphy* v. *Jack,* 142 N. Y. 215, [40 Am. St. Rep. 590, 36 N. E. 882], and *Oberman B. Co.* v. *Adams,* 35 Ill. App. 540, take the opposite view.   *Oberman* v. *Adams,* so far as applicable here, is overruled by the later case in the court of appeals and the supreme court of Illinois above cited.   In *Murphy* v. *Jack* the point received slight attention.   The other two cases, as is pointed out in 6 L. R. A. (N. S.) 1180, in a note to the Georgia case, are contrary to the weight of authority.   The respondent cites the following cases, claiming that they also are contrary to the rule we have announced: *People* v. *McKane,* 143 N. Y. 474, [38 N. E. 950] ; *Stepp* v. *State,* 31 Tex. Cr. App. 349, [20 S. W. 753] ; *People* v. *Strollo,* 191 N. Y. 42, [83 N. E. 573] ; *Deering Co.* v. *Shumpik,* 67 Minn. 348, [69 N. W. 1088] ; *Harrison G. Co.* v. *Penn. R. Co.,* 145 Mich. 712, [108 N. W. 1081], and *Lord Electric Co.* v. *Morrill,* 178 Mass. 304, [59 N. E. 807].   In each of these cases there was either a recognition of the voice of the other party or other sufficient evidence of his identity, and the remarks indicating a contrary doctrine than here stated are *obiter dictum.*   The Minnesota case, so far as it is contrary to the main current of authority is, in effect, overruled by the later decision in *Barrett* v. *Magner,* 105 Minn. 120, [127 Am. St. Rep. 531, 117 N. W. 245].

In the application of the rule many of the conditions we have mentioned are usually deemed matters of judicial knowledge, or as implied from other facts, and are not expressly shown.   The general rule, as gathered from the foregoing decisions, is that where it is shown that the witness called up the other party at his place of business, through the central station with which both were connected, and received a response as in the usual course of business over the telephone, this is sufficient *prima facie* identification of the speaker at the other end of the line as the party called, or his authorized agent, and that, upon such proof, the ensuing conversation, if otherwise admissible, may be testified to by the witness. It is proper to add that the weight of such evidence depends largely upon the circumstances of each case and is always a question for the trial court or jury.   The court below erred

in excluding the evidence of Veeder and Jackson relating to this subject.

Each of the messages in question were written upon a blank provided by the defendant containing a contract purporting to exempt it from liability for damages in excess of the charges for transmission. It is claimed that this relieves the defendant from the damages here claimed. The contract is as follows:—

"To guard against mistakes or delays, the sender of a message should order it repeated; that is, telegraphed back to the originating office for comparison. For this, one-half the regular rate is charged in addition.

"It is agreed between the sender of the following message and this company, that said company shall not be liable for mistakes or delays in transmission or delivery, or for nondelivery of any *unrepeated* message, beyond the amount received for sending the same; nor for any mistakes or delays in the delivery of any *repeated* message, beyond fifty times the sum received for sending the same, unless specially insured, nor in any case for delays arising from unavoidable interruption in the working of its lines, or for errors in cipher or obscure messages. . . .

"Correctness in the transmission of a message to any point on the lines of this company can be *insured* by contract in writing, stating agreed amount of risk, and payment of premium thereon, at the following rates, in addition to the usual charges for repeated messages, viz.: one per cent, for any distance not exceeding 1,000 miles, and two per cent for any greater distance."

This contract is identical with those considered by this court in *Hart* v. *Western U. T. Co.,* 66 Cal. 581, [56 Am. Rep. 119, 6 Pac. 637]; *Redington* v. *Pacific P. T. C. Co.,* 107 Cal. 321, [48 Am. St. Rep. 132, 40 Pac. 432], and *Coit* v. *Western U. T. Co.,* 130 Cal. 661, [80 Am. St. Rep. 153, 53 L. R. A. 678, 63 Pac. 84], except that the words, "whether happening by negligence of its servants or otherwise," occurred in those messages in the second paragraph immediately after the words, "unrepeated message," and before the word, "beyond." It was decided in those cases that the taking of such contract was a reasonable precaution by the company, that it was lawful and binding upon all senders of messages who assented to

it and that it exempted the telegraph company from liability, except as stated, for any cause except willful misconduct or gross negligence.

It is admitted that the usual tolls for such messages were in each instance paid to the defendant, and that each was an *unrepeated* message. Upon the trial, however, the plaintiff expressly waived any claim for the amount of the tolls paid as damages. For this reason, if no further damage appeared, the court below was justified in granting the nonsuit.

The message from Porter at Chicago to Veeder at the Kohl building in San Francisco was received at the main office of the defendant in the Ferry building in San Francisco at 6:57 P. M. of January 8th. The defendant claims that this was not proven. The evidence shows, however, that a note of that time was made by the defendant upon the copy of the message delivered by it to Veeder, and from what was said at the trial concerning this fact, by the court and counsel, it is a fair inference that these figures were intended by the defendant as a note of the hour and minute of the arrival of the message at its office in the Ferry building. It, therefore, constitutes evidence of that effect. Street-cars were then running frequently from a point near the Ferry building, along California Street, and directly in front of the Kohl building, to which the message was directed. According to the evidence offered and improperly excluded we must assume that the plaintiff would have been able to prove thereby that within half an hour after defendant had received this message, and while the copy for delivery was lying among the messages in its possession at the Ferry building office, and then awaiting delivery, Veeder inquired of defendant's agent at said office to learn if such message had been received by the defendant, and that he was informed by defendant's agent that none such had been received. After receiving this information that the telegram was important and that Veeder could be communicated with by telephone the defendant failed to deliver either this telegram or the one received later to Jackson, apparently on the same subject, on that evening, and so far as appears, made no effort to do so or to inform Veeder thereof. If these facts had been proven they would have tended to prove gross neglect on the part of the defendant in failing to deliver the Veeder message on that day, or to inform Veeder of its arrival.

Such evidence would support a finding of gross negligence. It is fully as strong as that held sufficient in *Redington* **v.** *Pacific P. T. C. Co.,* 107 Cal. 321, [48 Am. St. Rep. 132, 40 Pac. 432]. It follows, therefore, that, under any tenable theory of the effect of the contract, the plaintiff was deprived of the opportunity of proving such gross negligence.

The respondent contends that the evidence does not show that the plaintiff has sustained any damage except to the amount of the charges which, as above stated, the plaintiff waived. Taking the evidence as a whole, it is plain that if either message had been received by the plaintiff's agents during the evening of January 8th, the option would have been exercised by them on behalf of the plaintiff. In that event, the Iron Works would have been bound to furnish the pipe and construct the Mine Line for one hundred and forty-three thousand dollars. After waiting until late that evening for the expected telegram Jackson and Field agreed that the option should be extended for an additional period of fifteen days but that the Iron Works should be entitled to change the price mentioned in said contract. Within the fifteen days thus allowed the plaintiff and the Risdon Iron Works agreed to and executed a modification of the contract. The evidence shows that this was the best contract the plaintiff could obtain for the Mine Line. By its provisions the price for the Mine Line, instead of being fixed at one hundred and forty-three thousand dollars, was to be at the rate of eight cents per pound for the weight of metal furnished for the Mine Line. Jackson testified that this change added to the price of the Mine Line the sum of $21,252 in excess of the sum of one hundred and forty-three thousand dollars fixed by the first contract. He further testified that the price of steel had raised in the interval between the making of the first contract and the eighth day of January about one-quarter to one-half a cent. There was a provision in the first contract that if the price of steel rose before the option was exercised, the price fixed should be increased accordingly. Jackson stated that he was not sure that the increase was no more than half a cent per pound. From this respondent argues that the actual advance may have been enough to cover the difference in price between the two contracts and hence that no loss was shown. It is apparent, however, from all of

the evidence that Jackson did not intend to suggest that so great an advance was made as would be necessary to cover this difference.    It would have required a raise of one and one-half cents per pound to have had that effect.    His remark was evidently intended as a mere suggestion that there was some raise in the price of steel which would have increased somewhat the stated price in the original contract.    Such is the fair inference from the whole testimony, and upon a motion for nonsuit all reasonable inferences must be resolved in favor of the plaintiff.    We add that in stating the effect of the evidence we have kept in mind the rule in motions for nonsuit and have accordingly given it the construction most favorable to the plaintiff.    We think a substantial loss and damage from the failure to exercise the option on January 8th was sufficiently shown.

The California decisions above cited are all cases of mistakes made in the words of the message in transmitting it through the wires or in receiving it at the office of its destination.    The negligence complained of in the present case is a delay in the delivery of the message after it had been correctly transmitted.    The plaintiff contends that there is an obvious distinction between errors or delays in transmission and a delay in the delivery of a message after its arrival.    It is argued that since the repeating of a message would have no tendency to prevent a delay in delivery, but merely secures accuracy in transmission, it has no logical relation to any other object; that as the provision for insurance applies only to accuracy of transmission, and the contract as a whole affords the sender no means of protection against a delay in the subsequent delivery, the question of the reasonableness of such a contract, and its accordance with public policy, is not settled by said decisions.    Able and exhaustive arguments are presented on each side of this question.

The question whether the restriction of liability for errors in transmission is void because contrary to public policy has produced an unusual conflict in the authorities.    In a comparatively few jurisdictions, outside of California, the contract is declared to be valid unless there is gross negligence or willful misconduct.    These are as follows: Maryland, in *United States Tel. Co.* v. *Gildersleeve,* 29 Md. 232, [96 Am. Dec. 519] ; Massachusetts, in *Wheelock* v. *Postal etc. Co.,* 197

Mass. 125, [14 Ann. Cas. 188, 83 N. E. 313]; Michigan, in *Birkett* v. *Western Union Tel. Co.,* 103 Mich. 361, [50 Am. St. Rep. 374, 33 L. R. A. 404, 61 N. W. 645]; New York, in *Halsted* v. *Postal etc. Co.,* 193 N. Y. 303, [127 Am. St. Rep. 952, 19 L. R. A. (N. S.) 1021, 85 N. E. 1078]; Rhode Island, in *Stone* v. *Postal etc. Co.,* 31 R. I. 180, [76 Atl. 762]; Texas, in *Womack* v. *Western Union Tel. Co.,* 58 Tex. 176, [44 Am. Rep. 614]; the United States supreme court in *Primrose* v. *Western Union Tel. Co.,* 154 U. S. 1, [38 L. Ed. 883, 14 Sup. Ct. Rep. 1098], and in England, *McAndrew* v. *Telegraph Co.,* 17 Com. B. 3; 25 L. J. C. B. 26.  In South Dakota and Kansas there are decisions which concede its validity for the purposes of the case but affirm the judgment against the company on the ground that gross negligence was proved.  (*Lothian* v. *Western Union Tel. Co.,* 25 S. D. 319, [126 N. W. 621]; *Western Union Tel. Co.* v. *Crane,* 38 Kan. 683, [5 Am. St. Rep. 795, 17 Pac. 309].)  Pennsylvania decisions seem to conflict with each other.  *Passmore* v. *Western Union Tel. Co.,* 78 Pa. St. 238, treats the case as an action in tort and seems to hold such contract valid as a rule of business, the violation of which by the sender will exonerate the company, as in a case of contributory negligence.  In the later case of *Bailey* v. *Western Union Tel. Co.,* 227 Pa. St. 529, [19 Ann. Cas. 895, 76 Atl. 739], the court states the rule to be settled that a telegraph company "cannot stipulate for exemption from liability caused by its own negligence."

For the opposite side, the following states declare such contracts to be against public policy and void as a protection to the company against its own ordinary negligence.  We cite but one case from each state: Alabama, in *American etc. Co.* v. *Daugherty,* 89 Ala. 196, [7 South. 660]; Arkansas, in *Western Union Tel. Co.* v. *Short,* 53 Ark. 440, [9 L. R. A. 744, 14 S. W. 649]; Florida, in *Western Union Tel. Co.* v. *Milton,* 53 Fla. 496, [125 Am. St. Rep. 1077, 11 L. R. A. (N. S.) 560, 43 South. 495]; Georgia, in *Western Union Tel. Co.* v. *Blanchard,* 68 Ga. 299, [45 Am. Rep. 480]; Illinois, in *Western Union Tel. Co.* v. *Tyler,* 74 Ill. 168, [24 Am. Rep. 279]; Indiana, in *Western Union Tel. Co.* v. *Meredith,* 95 Ind. 94; Idaho, in *Strong* v. *Western Union Tel. Co.,* 18 Idaho, 389, [Ann. Cas. 1912A, 55, 30 L. R. A. (N. S.) 409, 109 Pac. 910; Iowa, in *Harkness* v. *Western Union Tel. Co.,* 73 Iowa, 193, [5

Am. St. Rep. 672, 34 N. W. 811]; Kentucky, in *Western Union Tel. Co.* v. *Eubanks,* 100 Ky. 601, [66 Am. St. Rep. 361, 36 L. R. A. 711, 38 S. W. 1068]; Maine, in *Ayer* v. *Western Union Tel. Co.,* 79 Me. 497, [1 Am. St. Rep. 363, 10 Atl. 495]; Mississippi, in *Postal etc. Co.* v. *Wells,* 82 Miss. 740, [35 South. 190]; Missouri, in *Reed* v. *Western Union Tel. Co.,* 135 Mo. 668, [58 Am. St. Rep. 609, 34 L. R. A. 492, 37 S. W. 904]; New Mexico, in *Western Union Tel. Co.* v. *Longwill,* 5 N. M. 308, [21 Pac. 339]; North Carolina, in *Williamson* v. *Postal etc. Co.,* 151 N. C. 228, [65 S. E. 974], overruling *Lassiter* v. *Telegraph Co.,* 89 N. C. 334 on this point; Ohio, in *Telegraph Co.* v. *Griswold,* 37 Ohio St. 313, [41 Am. Rep. 500]; Oklahoma, in *Blackwell* v. *Western Union Tel. Co.,* 17 Okla. 381, [10 Ann. Cas. 855, 89 Pac. 235]; Tennessee, in *Pepper* v. *Telegraph Co.,* 87 Tenn. 559, [10 Am. St. Rep. 699, 4 L. R. A. 660, 11 S. W. 783]; Utah, in *Mertz* v. *Western Union Tel. Co.,* 7 Utah, 449, [13 L. R. A. 510, 27 Pac. 172]; Vermont, in *Gillis* v. *Western Union Tel. Co.,* 61 Vt. 466, [15 Am. St. Rep. 917, 4 L. R. A. 611, 17 Atl. 736]; Wisconsin, in *Fox* v. *Postal etc. Co.,* 138 Wis. 648, [38 L. R. A. (N. S.) 490, 120 N. W. 399].

In this connection it may be observed that it is somewhat difficult to reconcile the California decisions with our Civil Code. Section 2162 provides that "A carrier of messages for reward must use great care and diligence in the transmission and delivery of messages." Section 1667 declares that a contract which is contrary to an express provision of law or to the policy of express law is unlawful. Section 1668 declares that "all contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own . . . violation of law, whether willful or negligent, are against the policy of the law." It is essential to the legal existence, of a contract, that is, to its recognition by the law as a contract, that it shall have a lawful object. (Sec. 1550.) Where the object of a contract is unlawful the contract is void. (Sec. 1598.) It seems clear that if the law requires the telegraph company to use great care and diligence in the transmission and delivery of messages, and the object of this contract, directly or indirectly, is to relieve it from responsibility for the damages caused by its failure to use great care and diligence in so doing, or, in other words, by its negligent violation of section 2162, then by the express provision of section 1668 the

contract is against the policy of the law. If that be the case, section 1667 makes it unlawful, and section 1598 declares that it is void. A person guilty of ordinary negligence has certainly failed to use great care and diligence. It appears logically to follow that a decision that such a contract will exempt the company from everything except gross negligence or willful misconduct is directly in the teeth of these statutory provisions. There is much force in the statement which Justice Ross, the author of the opinion in *Hart* v. *Western Union Tel. Co.*, afterwards made as judge of the United States circuit court in *Western Union Tel. Co.* v. *Cook*, 61 Fed. 629, [9 C. C. A. 684], declaring a contrary doctrine as follows: "It would be against reason and public policy to hold that it is permissible for such a company to stipulate for immunity from liability for a failure to exercise the care and diligence that the statute under which it operates declares it shall exercise."

Under these circumstances, we may consider whether or not the contract in question should be construed to apply to delays in delivery of a message which has been correctly transmitted. These contracts are prepared by the telegraph company and printed upon all of its blanks provided for the use of the public. They are not often the result of negotiation between the parties. The sender has no choice, nor any reasonable opportunity to make terms not specified in the printed contract. Although he does not sign it he is presumed to have seen it, and from his failure to object, he is taken to have assented to it. Hence, if it is uncertain in any particular, its language on that point is to be interpreted most strongly against the company. (Civ. Code, sec. 1654.) The subject to which it was intended to relate and the delays and mistakes against which it was intended to provide are shown by the opening words, to wit: "To guard against mistakes or delays, the sender of a message should order it repeated." Where a guard is offered against mistakes and delays which are not more particularly described, a reasonable construction of the language is that the mistakes and delays intended are those which the proposed guard would prevent; in this case, mistakes and delays which a repetition of the message would disclose, so that they could be immediately corrected or avoided. That this was the object and meaning of the con-

tract is further shown by the final proposal to insure "correctness in the transmission of a message to any point on the lines of this company." This language does not suggest, as some of the decisions holding the contract valid intimate, promptness in delivery after arrival. It plainly confines the insurance to the subject of correctness or accuracy in transmitting it to the company's delivering office on its lines and does not refer to delays in subsequent delivery. The company has power only to make reasonable regulations. If the condition sought to be imposed requires an act to be done to protect the sender against a certain mischance and such act would have no tendency to do so, the regulation could not be deemed reasonable. The contract should therefore not receive this construction unless no other meaning can reasonably be deduced. For these reasons it should be interpreted to provide only for delays and mistakes occurring in the forwarding of a message from the company's desk where it is received from the sender to the company's office where it is written out and made ready for delivery to the addressee.

There are some cases in the states which hold the contract valid as to errors in transmission which extend the rule to delays in subsequent delivery. But the better reason and the greater number of cases uphold the views we have stated. In Texas the contract is held valid as to mistakes in transmission but invalid with respect to delays in delivery. (*Gulf etc. Co.* v. *Wilson,* 69 Tex. 741, [7 S. W. 653] ; *Western Union Tel. Co.* v. *Bennett* (Tex. Civ. App.), 124 S. W. 154.) In *Barnes* v. *Western Union Tel. Co.,* 24 Nev. 140, [77 Am. St. Rep. 791, 50 Pac. 438], and *Western Union Tel. Co.* v. *Graham,* 1 Colo. 234, [9 Am. Rep. 136], it is conceded that it is valid against errors in transmission but held to be void as to delays in delivery. In all of these cases the distinction we have pointed out is held to be good. In *Box* v. *Postal Tel. Co.,* 165 Fed. 138, [28 L. R. A. (N. S.) 566, 91 C. C. A. 172], the court says: "Although the regulation purports to be made to guard against mistakes or delays, it should be construed to refer to such mistakes and delays as could be corrected or avoided by repetition or comparison." In *Beatty* v. *Western Union Tel. Co.,* 52 W. Va. 412, [44 S. E. 310], the court declares that "This condition has no relevancy except as to such failure or error as might be cured by repetition; it is only to errors preventable by repe-

tition that such a condition logically applies.'' The company in that case was held liable for a negligent failure to deliver, notwithstanding the contract in question.

The judgment is reversed.

Sloss, J., and Angellotti, J., concurred.

Hearing in Bank denied.